## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FADI AL MAQALEH, <u>et</u> <u>al</u>.,**<br><br>    **Petitioners**,<br><br>        **v.**<br><br>**ROBERT GATES, <u>et</u> <u>al</u>.,**<br><br>    **Respondents.** | **Civil Action No.  06-1669** |
| **AMIN AL BAKRI, <u>et</u> <u>al</u>.,**<br><br>    **Petitioners**,<br><br>        **v.**<br><br>**BARACK H. OBAMA, et al.,**<br><br>    **Respondents.** | **Civil Action No.  08-1307** |
| **REDHA AL-NAJAR, <u>et</u> <u>al</u>.,**<br><br>    **Petitioners**,<br><br>        **v.**<br><br>**ROBERT GATES, <u>et</u> <u>al</u>.,**<br><br>    **Respondents.** | **Civil Action No.  08-2143** |

## <u>MEMORANDUM OPINION</u>

Before the Court are respondents' motions to dismiss petitioners' three amended petitions for habeas corpus.  The petitioners are all third party nationals who have been held in various facilities at Bagram Airfield in Afghanistan for nine years or more.  Three years ago, the Court concluded that section 7(a) of the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat. 2600, was unconstitutional as applied to these petitioners and that they were therefore entitled to challenge their detentions through habeas corpus petitions.  <u>Al Maqaleh v.</u>

Gates, 604 F. Supp. 2d 205, 208-09 (D.D.C. 2009) ("Al Maqaleh I").  A year later, the D.C.

Circuit reversed that decision, holding that "the jurisdiction of the courts to afford the right to

habeas relief and the protection of the Suspension Clause does not extend to aliens held in

Executive detention in the Bagram detention facility in the Afghan theater of war."  Al Maqaleh

v. Gates, 605 F.3d 84, 99 (D.C. Cir. 2010) ("Al Maqaleh II").

Following the court of appeals' decision, petitioners filed a Joint Petition for Panel

Rehearing, which the court of appeals denied in a brief per curiam order.  7/23/2011 Per Curiam

Order, Al Maqaleh II, 605 F.3d 84 (D.C. Cir. 2010) (Nos. 09-cv-5265, 09-cv-5266, 09-cv-5267).

The court of appeals wrote:

> In support of their petition for panel rehearing, appellees, citing evidence not in
> the record, argue that the government's decision to transfer the Bagram prison
> facility to Afghan control undermines the rationale of our May 21, 2010, decision.
> Our denial of this petition is without prejudice to appellees' ability to present this
> evidence to the district court in the first instance.

Id. at 1.  Petitioners have now returned to this Court to file amended habeas petitions citing that

evidence, along with other evidence that they claim "undermines the rationale" of the court of

appeals' decision.  See Al Maqaleh's Second Am. Pet. for Writ of Habeas Corpus [ECF 63]

("Habeas Pet.").[1]  Respondents have moved to dismiss the amended petitions.  Mot. to Dismiss

Am. Pets. for Writs of Habeas Corpus [ECF 64] ("Resp. MTD").  A hearing was held on the

motions on July 16, 2012.  Subsequently, petitioners filed additional factual materials with the

Court on September 24, 2012.  Ptrs.' Decls. Filed in Resp. to Court's Order [ECF 83] ("Ptrs.'

---

[1]  The other two petitioners make the same claims in their petitions.  See Al Bakri's Am. Pet. for
a Writ of Habeas Corpus & Compl. for Decl. & Inj. Relief [08-cv-1307, ECF 58]; Al-Najar's
First Am. Petition for Writ of Habeas Corpus [08-cv-2143, ECF 52].  The petitions and the
motions to dismiss in the three cases are substantively identical, so the Court will cite only to the
documents in Al Maqaleh's case, 06-cv-1669.

Supp. Decls."). Respondents filed a response to these materials on October 12, 2012. Resp. to Ptrs.' Supplemental Materials [ECF 84] ("Supp. Resp.").

After carefully considering petitioners' filings and the evidence cited therein, the Court concludes that the petitions must be dismissed. As the many lengthy opinions previously written on this issue attest, determining the scope of a federal court's habeas jurisdiction can be enormously complicated. But given the D.C. Circuit's opinion in this case, the issue now before this Court is quite narrow: whether petitioners' new evidence undermines the rationale of the court of appeals' decision. Consistent with the one other district court that has faced this issue, this Court concludes that the answer to that question is no. See Wahid v. Gates, — F. Supp. 2d —, 2012 WL 2389984 (D.D.C. 2012).

## BACKGROUND

This Court's prior opinion fully laid out the facts of these cases, and the Court will not repeat most of those facts here. See Al Maqaleh I, 604 F. Supp. 2d at 209-10. Briefly, the United States has designated all three petitioners as enemy combatants and detained them at Bagram Airfield in Afghanistan ("Bagram"). Fadi al Maqaleh is a citizen of Yemen who claims to have been captured at an unspecified location outside of Afghanistan, although respondents dispute this. Id. at 209-10. Amin al Bakri is also a citizen of Yemen and was captured in Thailand. Id. at 209. Redha al-Najar is a citizen of Tunisia who was captured in Pakistan. Id. Each petitioner contests his designation as an enemy combatant and seeks to challenge his detention through a habeas corpus petition. Id.

The legal framework governing the scope of habeas corpus jurisdiction is set forth in Boumediene v. Bush, 553 U.S. 723 (2008). There, the Supreme Court first determined that

section 7 of the MCA, 28 U.S.C. § 2241(e), denied federal courts jurisdiction over the habeas

petitions of enemy combatant aliens detained abroad.  Id. at 736.  The Court then turned to the

question whether MCA § 7 unconstitutionally suspended the writ of habeas corpus as applied to

detainees at Guantanamo Bay.  Id. at 733, 739.  The Court explained that "at least three factors

are relevant in determining the reach of the Suspension Clause":

> (1) the citizenship and status of the detainee and the adequacy of the process
> through which that status determination was made; (2) the nature of the sites
> where apprehension and then detention took place; and (3) the practical obstacles
> inherent in resolving the prisoner's entitlement to the writ.

Id. at 766.  After weighing these factors, the Supreme Court concluded that detainees held at

Guantanamo were entitled to bring habeas corpus petitions in the federal courts.  Id. at 798.

This Court and the D.C. Circuit both recognized that Boumediene's three-part test applies

to this case.  In applying the test to the facts here, the D.C. Circuit reached the following

conclusions.  First, the court held that the "citizenship and status" factor supported petitioners'

argument that they were entitled to bring habeas petitions, because the petitioners were similarly

situated to the detainees at Guantanamo.  Al Maqaleh II, 605 F.3d at 95-96.  With respect to the

"adequacy of process" factor, the court of appeals found that the petitioners actually had a

stronger claim for entitlement to the writ than did the Guantanamo detainees, because the

procedural protections then afforded to detainees at Bagram were even weaker than those at

Guantanamo.  Id. at 96.

But the court of appeals found that the second factor, "the nature of the sites where

apprehension and then detention took place," weighed "heavily in favor" of the respondents.  Id.

In the court's view, there was a vast difference between Guantanamo – "a territory that, while

4

technically not part of the United States, is under the complete and total control of our Government," id. (citations omitted) – and Bagram Airfield, where "there is no indication of any intent to occupy the base with permanence, nor is there hostility on the part of the 'host' country." Id. at 97.  Given those differences, the D.C. Circuit found that "the United States [may have] de facto sovereignty over Guantanamo" but that "the same simply is not true with respect to Bagram."  Id.  Hence, the court concluded that the Suspension Clause was far less likely to apply at Bagram.  Id.

The court of appeals then found that the third factor, "the practical obstacles inherent in resolving the petitioner's entitlement to the writ," weighed "overwhelmingly" against the petitioners.  Id.  The court stressed that Bagram was located in a "theater of war" where "active hostilities" were still being conducted.  Id.  The court saw three critical problems with allowing detainees at such a site to bring habeas petitions.  First, the court worried that habeas litigation would "'divert . . . efforts and attention from the military offensive abroad to the legal defensive at home.'"  Id. at 98 (quoting Johnson v. Eisentrager, 339 U.S. 763, 779 (1950)).  The court was also wary of "'judicial interference with the military's efforts to contain enemy elements, guerilla fighters, and were-wolves.'"  Al Maqaleh, 605 F.3d at 97 (quoting Boumediene,128 S. Ct. at 2261).  In addition, the court observed that "'the result of such enemy litigiousness would be a conflict between judicial and military opinion highly comforting to enemies of the United States.'"  Id. at 98 (quoting Eisentrager, 339 U.S. at 779).  The court of appeals emphasized that the Supreme Court in Boumediene had expressly noted that the outcome in that case might have been different "'if the detention facility were located in an active theater of war,'" id. at 97-98 (quoting Boumediene, 553 U.S. at 770), and indicated that Bagram's location was a critical factor

in its decision.

Finally, the D.C. Circuit wrote that it did "not ignore the arguments of the detainees that

the United States chose the place of detention and might be able to evade judicial review of

Executive detention decisions by transferring detainees into active conflict zones, thereby

granting the Executive the power to switch the Constitution on or off at will." Id. at 98 (internal

quotation marks and citations omitted); see Boumediene, 553 U.S. at 765.  But, the court of

appeals concluded, "that is not what happened here."  Al Maqaleh II, 605 F.3d at 99.  Explaining

its view that manipulation had not occurred, the court wrote:

> [T]he notion that the United States deliberately confined the detainees in the
> theater of war rather than at, for example, Guantanamo, is not only unsupported
> by the evidence, it is not supported by reason. To have made such a deliberate
> decision to "turn off the Constitution" would have required the military
> commanders or other Executive officials making the situs determination to
> anticipate the complex litigation history set forth above and predict the
> Boumediene decision long before it came down.

Id. at 99.  The court expressed some doubt that such purposeful evasion would even be relevant

to the Boumediene test, but concluded that it "need[ed] [to] make no determination on the

importance of this possibility, given that it remains only a possibility."  Id. at 98.

## STANDARD

"[R]esponding to a habeas petition with a motion to dismiss is common practice."  White

v. Lewis, 874 F.2d 599, 603 (9th Cir. 1989) (citing Murray v. Carrier, 477 U.S. 478, 483 (1986)).

A motion to dismiss for lack of subject matter jurisdiction in habeas cases, like jurisdictional

motions in other civil cases, is subject to review under the standards of the Federal Rules of Civil

Procedure.  See Rasul v. Bush, 215 F. Supp. 2d 55, 61 (D.D.C. 2002), aff'd, Al Odah v. United

States, 321 F.3d 1134 (D.C. Cir. 2003), rev'd on other grounds, Rasul v. Bush, 542 U.S. 466

(2004) (applying Fed. R. Civ. P. 12(b)(1) to the government's motion to dismiss a pending habeas

petition on jurisdictional grounds); see also In re Guantanamo Detainee Cases, 355 F. Supp. 2d

443, 453 (D.D.C. 2005) ("The respondents . . . seek dismissal of all counts as a matter of law

under Fed. R. Civ. P. 12(b)(6) for failing to state a claim upon which relief can be granted.  In the

alternative, the respondents seek a judgment based on the pleadings pursuant to Fed. R. Civ. P.

12(c)."), vacated, Boumediene v. Bush, 476 F.3d 981 (D.C. Cir. 2007), rev'd, 553 U.S. 723

(2008).

Under Rule 12(b)(1), those seeking to invoke the jurisdiction of a federal court –

petitioners here – bear the burden of establishing that the court has jurisdiction.  See US Ecology,

Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000) (citing Steel Co. v. Citizens for a

Better Env't, 523 U.S. 83, 103-04 (1998)); see also Grand Lodge of Fraternal Order of Police v.

Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) ("[A] Rule 12(b)(1) motion imposes on the court

an affirmative obligation to ensure that it is acting within the scope of its jurisdictional

authority."); Pitney Bowes, Inc. v. U.S. Postal Serv., 27 F. Supp. 2d 15, 19 (D.D.C. 1998).

Although a court must accept as true all of petitioners' factual allegations when reviewing a

motion to dismiss pursuant to Rule 12(b)(1), see Leatherman v. Tarrant Cty. Narcotics

Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993), "'factual allegations . . . will bear

closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to

state a claim." Grand Lodge, 185 F. Supp. 2d at 13-14 (quoting 5A Charles Alan Wright &

Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1990)).  At the stage of litigation

when dismissal is sought, a petitioner's habeas petition must be construed liberally, and the

petitioner should receive the benefit of all favorable inferences that can be drawn from the

alleged facts.  See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir.

1997).  A court may consider material other than the allegations in the habeas petition in

determining whether it has jurisdiction to hear the case, so long as it still accepts the factual

allegations in the habeas petition as true.  See Jerome Stevens Pharmaceuticals, Inc. v. FDA, 402

F.3d 1249, 1253-54 (D.C. Cir. 2005); St. Francis Xavier Parochial Sch., 117 F.3d at 624-25 n.3;

Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

## ANALYSIS

Petitioners argue here, as they did in their petition for rehearing in the D.C. Circuit, that

their habeas petitions should be reassessed for several reasons.  See Ptrs.' Opp. to Resp. MTD

("Ptrs.' Opp") at 6-9.  They contend first that new evidence shows that the United States does

intend to remain indefinitely at Bagram; second, that the United States has "facilitat[ed]" recent

criminal trials run by the Afghan government at Bagram, and that the Afghan government desires

foreign detainees to be removed and provided fair judicial process elsewhere, which shows that

the practical obstacles to conducting litigation at Bagram are far less serious than the court of

appeals believed; third, that the evidence shows that the United States was attempting to avoid

habeas jurisdiction by detaining petitioners at Bagram; and fourth, that the procedures used to

determine petitioners' status are unacceptable.  Each of these arguments will be addressed in turn.

### I.  Intent to remain at Bagram

One of the key factors behind the Supreme Court's opinion in Boumediene was "the

obvious and uncontested fact that the United States, by virtue of its complete jurisdiction and

control over the base, maintains de facto sovereignty over" Guantanamo Bay and had done so

since 1898.  Boumediene, 553 U.S. at 755, 765.  Moreover, Cuba "effectively ha[d] no rights as a

sovereign" at Guantanamo Bay unless and until the United States agreed to change the terms of its lease agreement or chose to abandon the base.  Id. at 753.  In this case, the D.C. Circuit placed great weight on the fact that the United States's control over the base at Bagram Airfield was less absolute than its control over Guantanamo Bay.

Petitioners offer the following new evidence that they argue shows that the D.C. Circuit's decision was incorrect.  Since late 2001 or early 2002, the United States has held both Afghan and non-Afghan detainees at Bagram.  The United States has recently begun transferring custody of Afghan detainees to the Afghan government.  See Resp. MTD, Decl. of William K. Lietzau ("Lietzau Decl.") ¶ 3.  Although respondents aver that they intend eventually to transfer custody of non-Afghan detainees to either the Afghan government, the detainee's home country, or a third country, they have no specific plans in place to do so.  See id. ¶¶ 3, 5, 9.  Petitioners conclude that the lack of specific plans to transfer non-Afghan detainees shows that the United States has the same sort of permanent control over non-Afghan detainees at Bagram that it has over detainees at Guantanamo Bay.  Ptrs.' Opp. at 6-7, 22-26.

To determine whether the information about the recent transfers of Afghan detainees undermines the rationale of the D.C. Circuit's decision, it is necessary to consider the information on which that court relied.  If, for example, the court of appeals based its opinion on specific representations about plans to cede custody of non-Afghan detainees within a certain time frame, or to transfer custody of non-Afghan detainees before transferring custody of Afghan detainees, this new information could be quite important.  But if the court's opinion rested on different grounds, the new information might be less important.

An examination of the parties' appellate briefs and the D.C. Circuit's opinion leads to the

conclusion that the court's information about future plans at Bagram was, in fact, quite limited. Respondents offered only vague assertions that the United States did not intend to maintain control over Bagram indefinitely.  See Appellants' Br., Al Maqaleh II, 605 F.3d 84 (D.C. Cir. 2010) (Nos. 09-cv-5265, 09-cv-5266, 09-cv-5267) at 34 ("In contrast to Guantanamo, the United States does not have any plans, or even a desire, to establish a permanent military base at Bagram. . . . [T]he United States intends to relinquish control of the Bagram Airfield after completing its mission in Afghanistan."); Appellants' Reply Br., Al Maqaleh II, 605 F.3d 84 (D.C. Cir. 2010) (Nos. 09-cv-5265, 09-cv-5266, 09-cv-5267) at 10 ("As the district court correctly found, the United States has no plans to establish a permanent military base at Bagram.").  The only factual material referenced in support of these claims was the lease for the base at Bagram Airfield, which "obligate[s] [the United States] to leave [Bagram] when it determines that the facility is no longer needed for military purposes."  Appellants' Br. at 34. Respondents alluded to the possibility of transferring detainees to the Afghan government, but provided absolutely no specifics.  Appellants' Reply Br. at 10 ("Indeed, the Commander of the U.S. military mission has directed that the goal of the United States is to transfer all detention operations in Afghanistan, to include the BTIF, to the Afghan government.") (internal quotation marks and citation omitted).[2]

Despite the lack of concrete evidence supporting respondents' claim that the United States would not remain at Bagram indefinitely, the D.C. Circuit concluded that the nature of the detention site "weigh[ed] heavily in favor of the United States" and specifically found that "there

---

[2]  The BTIF is the Bagram Theater Internment Facility, where detainees at Bagram Airfield were previously held.  In late 2009, all detainees were transferred to the Detention Facility in Parwan ("DFIP"), also located at Bagram Airfield.  Lietzau Decl. ¶ 2.

is no indication of any intent to occupy the base with permanence." Al Maqaleh II, 605 F.3d at

96-97.  Given the evidence before the court of appeals and its conclusion, this Court does not

believe that the recent transfers of Afghan detainees would have changed the court of appeals'

decision.  Respondents make the same general statements of intent to eventually leave Bagram

that they made before the D.C. Circuit; indeed, the first section of their brief is entitled "The

United States has no intention to remain at Bagram permanently."  Resp. MTD at 8; see also id.

at 9 (each representation made before the court of appeals about the United States's intention to

leave Bagram "remain[s] accurate today").  And as far as the record reveals, there has been no

change to the terms of the lease that obligates the United States to leave Bagram "when it

determines that the facility is no longer needed for military purposes."  Appellants' Br. at 34.

In addition, respondents continue to stress that their ultimate goal is still to transfer

custody of all detainees to the Afghan government, the detainee's home country, or a third

country.  William Lietzau, the Deputy Assistant Secretary of Defense for Detainee Policy,

explains in his declaration that the Combined Joint Interagency Task Force 435 ("Task Force")

has already begun transferring some detention facilities to the Afghan government and will

continue doing so based on "operational conditions, Afghan judicial capacity, and [whether the

Afghan government is] fully trained, equipped, and able to detain insurgents securely and to

perform its detention, prosecution, and incarceration responsibilities in accordance with

international obligations and Afghan law."  Lietzau Decl. ¶ 3.  Lietzau further explains that the

Task Force is planning construction of "additional detainee housing capacity adjacent to DFIP,"

id. ¶ 5, which will house non-Afghan detainees "pending the transfer of non-Afghan detainees to

their home countries or to third countries."  Id.  But, critically, Lietzau declares that "U.S. Forces

11

will eventually transition this additional detention capacity to the [Afghan government], consistent with the conditions-based approach discussed above." Id.  And at the end of his declaration, Lietzau broadly reaffirms the United States's goal of transferring custody of the detainees:

> As discussed above . . . the DFIP is not intended to serve as a permanent U.S. facility. The United States does not intend to continue to use the DFIP to detain any person pursuant to the Authorization for the Use of Military Force, as informed by the law of war, beyond the cessation of hostilities with the Taliban, al Qaida, and associated forces. The United States has no interest in holding detainees longer than necessary.

Id. ¶ 9.

In sum, nothing has changed about respondents' stated position with respect to detainees since this case was litigated before the D.C. Circuit: respondents still intend to transfer custody of all detainees to the Afghan government or elsewhere (but not to the United States).  Hence, petitioners must resort to the argument that the transfer of some detainees to the Afghan government makes it less likely that other detainees will someday be transferred, even though the United States continues to reaffirm its goal of transferring custody of all detainees.  But as a matter of logic, petitioners' argument makes little sense.  Indeed, one could convincingly argue that the opposite is true.  At the time this case was argued in the court of appeals, it would have been reasonable to wonder how committed the United States was to its amorphous goal of eventually ceding custody of detainees to another government.  That the United States has now transferred custody of numerous detainees to the Afghan government, however, demonstrates the sincerity of those representations.  In addition, the capacity the Afghan government is building to house and prosecute Afghan detainees may make it more likely that non-Afghan detainees can

12

eventually be transferred to the Afghan government, if not to other countries.  Hence, respondents' position on this point is no weaker than it was before the D.C. Circuit; indeed, if anything, it may be stronger.

## II.  Practical obstacles

In the court of appeals' view, the single most important factor in the <u>Boumediene</u> analysis was the "overwhelming[]" nature of the "practical obstacles" to conducting habeas litigation at Bagram.  <u>Al Maqaleh II</u>, 605 F.3d at 97.  After the D.C. Circuit's decision, the Afghan government began conducting criminal trials of detainees at Bagram.  Ptrs.' Opp. at 26.  The parties dispute how involved the United States is in these trials.  The United States describes them as "purely Afghan-run," Resp. MTD at 17, but petitioners disagree.  In their habeas petitions, they state that "the U.S. Military . . . allowed thirty-six full-blown trials of Afghan prisoners in its custody."  <u>Id.</u>  Quoting a Boston Globe article, petitioners explain that courts are composed of Afghan "judges, prosecutors, and forensic experts," but that Americans "mentor[]" them.  <u>Id.</u> (internal quotation marks and citations omitted).  In their briefing, petitioners adopt the formulation that the United States "facilitat[es]" trials run by the Afghan government.  Ptrs.' Opp. at 26.  Given the evidence petitioners have offered, the Court concludes that "facilitating" the trials – by allowing detainees to appear for trial and mentoring the Afghan participants – is an appropriate characterization of the United States's role.[3]

Petitioners argue that these trials – which involve "civilian lawyers and witnesses, along with journalists and observers from all over the world" – have been carried out without incident,

---

[3]  Petitioners also describe "jointly-run U.S.-Afghan proceeding[s] similar to an arraignment" that apparently precede the trials, but they say nothing more about these proceedings, how common they are, or what the United States's role actually is.  Habeas Pet. ¶ 121.

which shows that the "practical obstacles" to adjudicating Bagram detainees' habeas petitions are much less than the D.C. Circuit feared.  Ptrs.' Opp. at 26.  The Court disagrees.  That the <u>Afghan</u> government has chosen to conduct criminal trials of detainees does not indicate that there are no practical obstacles to the <u>United States</u> doing so.  Again, it is helpful to recall the specific concerns expressed by the D.C. Circuit.  First, the court thought that ordering military commanders to participate in habeas adjudications would "divert . . . efforts and attention" from the battlefield to the courtroom.  <u>Al Maqaleh II</u>, 605 F.3d at 98 (internal quotation marks and citations omitted).  A trial system run primarily by the Afghan government obviously requires many fewer U.S. military resources than would habeas adjudications conducted solely by the United States.  The Afghan government, not the United States, is providing the "judges, prosecutors, and forensic experts" who conduct the criminal trials; the United States provides only "mentor[ing]," which surely "divert[s]" less "effort[] and attention" from the battlefield than would full-blown habeas litigation conducted here.

The court of appeals also expressed concerns about the difficulties of litigating the petitions of detainees held in a "theater of war."  <u>Al Maqaleh II</u>, 605 F.3d at 98.  Again, the fact that the Afghan government has decided that it can conduct criminal trials on its own soil does not necessarily prove that a court in the United States could oversee litigation centered at Bagram or in the United States.  The security concerns may be different depending on which government is in charge of the litigation; it is quite plausible, for instance, that trials run by the Afghan government would produce less hostility and fewer security issues than litigation in Afghanistan orchestrated by the United States.  Finally, the court of appeals worried that conducting habeas adjudications of detainees held at Bagram would result in "a conflict between judicial and

14

military opinion highly comforting to enemies of the United States.'" Id. at 98 (internal quotation marks and citations omitted).  That issue is not present, however, when the Afghan government tries its own citizens with United States consent.  In sum, the fact that the Afghan government can try its own citizens simply does not provide much information about the United States's ability to adjudicate habeas petitions of Bagram detainees.

Petitioners have also submitted a letter to their counsel from Abdul Karim Khurram, Chief of Staff to the President of Afghanistan.  See Ptrs.' Supp. Decls., Letter from Abdul Karim Khurram to Ramzi Kassem and Tina Foster (Sept. 19, 2012) ("Khurram Letter").  Petitioners claim that the letter "confirms the Afghan government's position regarding this Court's possible exercise of jurisdiction" and "directly informs this Court's assessment of any 'practical obstacles' related to the Bagram prison's location" in Afghanistan.  Ptrs.' Supp. Decls., Declaration of Ramzi Kassem ("Kassem Decl.") ¶ 3.  The Court disagrees.  The letter states: "We have no desire for [non-Afghan detainees] to remain on our territory. . . . [T]he government of Afghanistan favors these individual[s] having access to a fair judicial process and adjudication of their case by a competent court."  As respondents point out, the Khurram Letter is a private letter to petitioners' counsel, does not indicate that Khurram is authorized to speak for the Afghan government, and arguably conflicts with contemporaneous public statements made by other Afghan officials.[4]  But even assuming that the Khurram Letter in fact represents the position of the Afghan government, the Afghan government's support for giving detainees habeas rights would not require a lesser diversion of military resources, change the fact that Afghanistan

---

[4]  Supp. Resp. at 9-10 (citing Charlie Savage & Graham Bowley, U.S. to Retain Role as a Jailer in Afghanistan, N.Y. TIMES, Sept. 5, 2012).

"remains a theater of war," or avert a potential conflict between the U.S. military and our courts.
See Al Maqaleh II, 605 F.3d at 97-98.  The D.C. Circuit clearly found that these practical
obstacles weighed "overwhelmingly" against the petitioners, and petitioners have not undermined
the rationale for that conclusion.

### III.  Executive manipulation

Petitioners also offer evidence that the United States has chosen to keep detainees at
Bagram specifically in order to avoid habeas jurisdiction.  Even if this is true, it is unclear
whether such purposeful evasion of habeas jurisdiction would affect the jurisdictional analysis.
Executive manipulation is not an explicit factor in three-part Boumediene test; on the other hand,
the Supreme Court's concern that "the political branches [could] switch the Constitution on or off
at will" by strategically choosing detention sites clearly influenced its decision.  Boumediene,
553 U.S. at 765.

The D.C. Circuit wrote that it "doubt[ed]" that evasion would go to "either the second or
the third of the Supreme Court's enumerated factors," but then added that such purposeful
manipulation might constitute an "additional factor" in the Boumediene analysis.  Al Maqaleh II,
605 F.3d at 98-99.  The court of appeals also found, however, that executive manipulation "is not
what happened here."  Id. at 98.  It therefore declined to decide how purposeful evasion of
jurisdiction might affect the Boumediene test, if at all.  Id.  Petitioners now argue that purposeful
evasion is exactly what happened here, and that the D.C. Circuit's decision on that issue would
have been different if that court had seen the evidence now presented to this Court.  In support of
their argument, petitioners cite newspaper articles, government memoranda, two declarations
from former government officials, and other materials.

The first problem with petitioners' argument is that most of the cited material is not new

at all.  Much of it, including the most convincing pieces of evidence, was publicly available even

before this Court issued its initial opinion in this case.  Petitioners did raise the issue of

purposeful evasion of jurisdiction before the court of appeals, Appellees' Br. at 34, but they chose

not to focus on the issue or to rely on any of the evidence presented here.  Not until the petition

for rehearing did petitioners offer any evidence on the manipulation question, and even there they

focused primarily on other issues.  Joint Pet. for Rehearing, Al Maqaleh II, 605 F.3d 84 (D.C.

Cir. 2010) (Nos. 09-cv-5265, 09-cv-5266, 09-cv-5267) ("Pet. Rehearing") at 12-14.  This Court

doubts that the D.C. Circuit's order denying panel rehearing, which by its terms only allowed

appellees to present to the district court new evidence on "the government's decision to transfer

the Bagram prison facility to Afghan control," see supra at 2, was meant to allow petitioners to

litigate anew an issue they could have litigated earlier.

Even setting aside waiver issues, however, the Court finds that the evidence amassed by

petitioners does not call into doubt the court of appeals' decision.  Petitioners' evidence runs as

follows.  They explain, citing government memoranda, that Bagram was initially a "collection

site" where U.S. officials decided which detainees should be sent to Guantanamo, but that the

"linkage between" Bagram and Guantanamo was "severed over time."[5]  They then cite newspaper

articles stating that transfers from Bagram to Guantanamo dropped sharply after the Supreme

Court found in June 2004 in Rasul v. Bush, 542 U.S. 466 (2004), that detainees at Guantanamo

---

[5]  Ptrs.' Opp. at 31-32 (citing Memorandum to the U.S. Deputy Sec'y of State, from Gregory
Suchan, Acting Asst. Sec'y for Political-Military Affairs, "Information Memorandum re:
Nationalities at Bagram," Jan. 24, 2002, available at
www.aclu.org/torturefoia/released/t2677_2679.pdf).

could bring habeas petitions.[6]  In addition, they cite two articles stating directly that detainees

were transferred to Bagram "in part" to avoid habeas jurisdiction; one quotes anonymous

"military figures" and another appears simply to be drawing an inference from transfer statistics.[7]

Finally, petitioners argue that there was in fact a "reverse" flow of detainees from Guantanamo in

the wake of Rasul.  They cite a 2010 newspaper article stating that four high-value detainees

were transferred away from Guantanamo (but not to Bagram) in the months before Rasul was

issued, because U.S. officials predicted the outcome of Rasul and wanted to ensure that those

detainees could not bring habeas petitions.[8]  They also state (in a point vigorously contested by

respondents) that more than 30 detainees were transferred from Guantanamo to Bagram and

other sites between 2007 and 2009.[9]  Finally, petitioners have submitted the declarations of

Colonel Lawrence B. Wilkerson (Ret.), former Chief of Staff to Secretary of State Colin Powell,

and Glenn Carle, a former CIA employee, stating that petitioners "likely" were transferred to

and/or kept at Bagram to "evade judicial review of their detention."  Ptrs.' Supp. Decls.,

Declaration of Colonel Lawrence B. Wilkerson (Ret.) ("Wilkerson Decl.") ¶ 14; Declaration of

Glenn Carle ("Carle Decl.") ¶ 14.  From this evidence, petitioners conclude that the Executive

chose to house detainees at Bagram to ensure that they would not be able to file habeas petitions.

---

[6]  Ptrs.' Opp. at 32 (citing Tim Golden & Eric Schmitt, A Growing Afghan Prison Rivals Bleak Guantánamo, N.Y. TIMES, Feb. 26, 2006).

[7]  Id. (citing Tim Golden & Eric Schmitt, A Growing Afghan Prison Rivals Bleak Guantánamo, N.Y. TIMES, Feb. 26, 2006); Habeas Pet. ¶ 74 (citing Jeff A. Bovarnick, Detainee Review Boards in Afghanistan: From Strategic Liability to Legitimacy, THE ARMY LAWYER 9, 18 (June 2010)).

[8]  Ptrs.' Opp. at 28 (citing Matt Apuzzo & Adam Goldman, CIA Flight Carried Secret from Gitmo, AP, Aug. 6, 2010).

[9]  Ptrs.' Opp. at 29; Resp. MTD at 15.

There are several reasons that the Court finds this evidence less persuasive than petitioners make it out to be. First, as respondents point out, the facts are not as one-sided as petitioners represent. It is undisputed that detainees were transferred from Bagram to Guantanamo in September 2004, undermining the theory that Rasul was a bright dividing line or that the government was instituting a "reverse flow" of detainees.[10] In addition, the four high-value detainees moved away from Guantanamo before Rasul was issued were actually moved back to Guantanamo in 2006.[11] Moreover, there are logical reasons unrelated to habeas petitions that the United States might have decided to house detainees at Bagram rather than Guantanamo. Most obviously, the majority of detainees are presumably captured in the middle east, half a world away from Guantanamo, and can more conveniently be detained closer, at least for some time. In addition, the international publicity and criticism surrounding Guantanamo had moved the Bush administration to make public statements that it "would like to close" Guantanamo as early as 2006.[12]

More important than these arguments, however, is the fact that the Court simply sees no way to accept petitioners' argument under the framework laid out by the D.C. Circuit. This is true for two reasons. First, the court of appeals was intimately familiar with the Supreme Court's habeas jurisprudence, including both the issuance of Rasul in 2004 and Boumediene's discussion about potential executive manipulation of habeas jurisdiction. See Al Maqaleh II, 605 F.3d at

---

[10]  Resp. MTD at 16 (citing Dep't of Defense, News Release, Sept. 22, 2004, available at https://ecf.dcd.uscourts.gov/doc1/04513414488).

[11]  Resp. MTD at 16; Matt Apuzzo & Adam Goldman, CIA Flight Carried Secret from Gitmo, AP, Aug. 6, 2010.

[12]  Resp. MTD at 14 (citing Bush Speaks of Closing Guantanamo Prison, Reuters, May 8, 2006).

90-92, 98.  Nonetheless, the court rejected petitioners' contention that the United States might

have made a strategic decision to house petitioners at Bagram rather than Guantanamo.  The D.C.

Circuit wrote that purposefully manipulating these petitioners' detention sites "would have

required the military commanders or other Executive officials making the situs determination to

anticipate the complex litigation history set forth above and predict the Boumediene decision

long before it came down [in 2008]," 605 F.3d at 99, an idea the court evidently found wholly

unconvincing.  If the D.C. Circuit rejected the argument that pre-Boumediene litigation could

have prompted strategic maneuvering on the part of the military and the executive branch, this

Court cannot find otherwise on the basis of evidence that, while perhaps new, is really no

different than what existed before.[13]

The second reason the Court cannot accept petitioners' argument is that it has no limiting

principle.  Petitioners are really arguing that a decision to hold detainees at any site other than

Guantanamo is suspect.  See, e.g., Tr. of 1/7/2010 Oral Arg., Al Maqaleh II, 605 F.3d 84 (D.C.

Cir. 2010) (Nos. 09-cv-5265, 09-cv-5266, 09-cv-5267) at 55-57.  But that would create universal

---

[13]  The Wilkerson and Carle Declarations, though executed recently, do not raise a new argument
and are largely cumulative of evidence previously submitted.  In fact, in their petition for
rehearing in the D.C. Circuit, petitioners cited a prior declaration given by Colonel Wilkerson in
another case, and they cited both that declaration and Glenn Carle's book in support of their
opposition to respondents' motion to dismiss in this Court.  See Pet. Rehearing at 13 n.15; Ptrs.'
Opp. at 32 n.20; Ptrs.' Supp. Mem. to Ptrs.' Opp. [ECF 71] ¶¶ 7-9.  While the new declarations,
unlike Colonel Wilkerson's prior declaration and Mr. Carle's book, refer specifically to the
petitioners in this case, they are really just conjecture.  Neither Colonel Wilkerson nor Mr. Carle
professes to have personal knowledge of petitioners' detentions, and both merely speculate about
the "likely" motivations for detaining petitioners at Bagram.  See Wilkerson Decl. ¶ 14; Carle
Decl. ¶ 14.  Such speculation is not new to this case.  Petitioners' argument based on the assertion
that the United States intentionally kept detainees away from Guantanamo to evade judicial
review was already considered and rejected by the D.C. Circuit.  See Al Maqaleh II, 605 F.3d at
99.  Because the Wilkerson and Carle Declarations do not add materially to the evidence that was
before the D.C. Circuit, this Court will not rely on them to reach a different conclusion here.

habeas jurisdiction, a result far beyond what <u>Boumediene</u> contemplated.  Most importantly for present purposes, that result would be clearly at odds with the D.C. Circuit's conclusions.  The panel members spent much of the oral argument searching for a limiting principle that would distinguish Bagram from any other military installation, and the panel specifically focused on the fact that petitioners' manipulation theory would create worldwide habeas jurisdiction.  Tr. of 1/7/2010 Oral Arg., <u>Al Maqaleh II</u>, 605 F.3d 84 (D.C. Cir. 2010) (Nos. 09-cv-5265, 09-cv-5266, 09-cv-5267) at 13 n.15.  The concern about the lack of a limiting principle was repeated in the opinion itself.  <u>See</u> <u>Al Maqaleh II</u>, 605 F.3d at 95.  Given these clear indications that the court of appeals was skeptical of any theory that would create universal jurisdiction, this Court cannot adopt petitioners' theory and its far-reaching implications.

Petitioners have requested that they be allowed to take jurisdictional discovery, which they believe will uncover facts establishing purposeful executive manipulation.  Petitioners cite civil cases from this circuit to argue that "a party must be given 'ample opportunity'" to take discovery on jurisdictional matters.  Ptrs.' Opp. at 34 (quoting <u>Sledge v. United States</u>, 723 F. Supp. 2d 87, 103 (D.D.C. 2010)).  But the Supreme Court held long ago that "the broad discovery provisions" of the Federal Rules of Civil Procedure do not apply in habeas cases.  <u>Harris v. Nelson</u>, 394 U.S. 286, 295 (1969).  Rather, courts may "'fashion appropriate modes of procedure' . . . to dispose of habeas petitions 'as law and justice require.'"  <u>Bracy v. Gramley</u>, 520 U.S. 899, 904 (1997) (quoting <u>Harris</u>, 394 U.S. at 299).  In the § 2254 context, <u>Harris</u> has been codified as a rule that habeas petitioners must show good cause for taking discovery.  <u>Bracy</u>, 520 U.S. at 901.

It appears that no court has yet specified what standard applies to a detainee habeas

petitioner seeking jurisdictional discovery.  But given that habeas petitioners are not entitled to jurisdictional discovery as of right, the Court concludes that sufficient cause for discovery has not been shown here. Petitioners' best argument for their evasion theory is simple logic: many detainees were once sent to Guantanamo, the Supreme Court has determined that detainees at Guantanamo have some habeas rights, and most detainees are no longer sent to Guantanamo. But that logic was as well known to the court of appeals over two years ago as it is to this Court now, and yet the court of appeals emphatically declared that evasion "is not what happened here." Al Maqaleh II, 605 F.3d at 98.  To undermine the D.C. Circuit's decision, petitioners would need very solid evidence of evasion – essentially a smoking gun.  But it is difficult to imagine that petitioners would have any chance of finding such a smoking gun – if one exists – without delving deeply into highly confidential government documents involving "the conduct of foreign relations [and] the war power," which "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." Mathews v. Diaz, 426 U.S. 67, 81 n.17 (1976).  This Court cannot permit what would essentially be a fishing expedition into such sensitive areas, particularly given the court of appeals' skepticism that manipulation occurred or that it would ultimately affect the Boumediene test.  Petitioners' request for discovery is accordingly denied.

## IV.  DRB procedures and determinations

Petitioners spend a substantial portion of their filings discussing the revised procedures (known as the "Detainee Review Board" or "DRB" procedures) used to determine whether detainees should be classified as enemy combatants, as well as whether and where they should be held.  Ptrs.' Opp. at 12-21.  The Court need address this topic only briefly.  The D.C. Circuit

found that the procedural protections available to Bagram detainees were much weaker than the procedural protections available to either the Guantanamo detainees or the detainees at issue in Eisentrager, and that the "adequacy of process" factor in the Boumediene test therefore "strongly favor[ed]" the petitioners.  Al Maqaleh II, 605 F.3d at 96 (internal quotation marks and citations omitted).  The DRB procedures have now been significantly revised.  See Resp. MTD at 18-24 (describing new procedures).  Petitioners devote much energy to arguing that the new procedures are still weaker than those available to the Guantanamo detainees, but the critical point – which petitioners concede, Ptrs.' Opp. at 14 – is that the revised procedures are at least marginally better and more detainee-protective than the old procedures at Bagram were.  Hence, even if the new procedural protections are still limited, this factor actually weighs more in favor of respondents than it did at the time of the D.C. Circuit's decision.

Petitioners also argue that the fact that the DRB has allegedly cleared some of them for release undermines the court of appeals' decision.  See Habeas Pet. ¶¶ 109-110; Ptrs.' Opp. at 12-13.  But the D.C. Circuit has previously explained that "whether a detainee has been cleared for release is irrelevant to whether a petitioner may be detained lawfully."  Almerfedi v. Obama, 654 F.3d 1, 4 n.3 (D.C. Cir. 2011); see also Awad v. Obama, 608 F.3d 1, 11 (D.C. Cir. 2010) ("the United States's authority to detain an enemy combatant is not dependent on whether an individual would pose a threat to the United States or its allies if released but rather upon the continuation of hostilities").  Petitioners offer no argument as to how these alleged DRB determinations would undermine the decision of the D.C. Circuit here, and this Court finds that they would not.

Finally, petitioners' argument based on events at their most recent DRB proceedings does not advance their position.  As further support for their argument that the DRB procedures are

arbitrary and inadequate, petitioners have submitted a declaration complaining that their attorneys "were not permitted to appear as witnesses in person or by telephone" at petitioners' September 20, 2012 DRB proceedings.  Ptrs.' Supp. Decls., Declaration of Tina M. Foster ¶ 23. But as respondents note, the Department of Defense told petitioners' attorneys that they could testify by phone; petitioners' attorneys did not participate by phone because once petitioners learned that their attorneys could not testify in person, they chose not to participate in the DRB proceedings and not to call their attorneys as witnesses.  Supp. Resp. at 11-12; id., Declaration of Robert F. Huard ¶¶ 3-4.  Hence, petitioners' DRB process has not been as arbitrary as they allege. Given this, and considering the procedural improvements discussed above, petitioners' recent submissions do not tip the "adequacy of process" factor more strongly in their favor.  See Al Maqaleh II, 605 F.3d at 96.

**CONCLUSION**

For the reasons given, the Court will grant respondents' motions to dismiss petitioners' amended petitions for habeas corpus.  A separate order accompanies this opinion.

     /s/ John D. Bates
JOHN D. BATES
United States District Judge

Dated: October 19, 2012